# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ASHLEY GARRETT, on behalf of herself and
all others similarly situated,

                Plaintiff,

    v.

CALL FEDERAL CREDIT UNION,

             Defendant.

Case No. 3:23-cv-678

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

## CLASS ACTION COMPLAINT

Plaintiff Ashley Garrett, on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding herself and on information and belief as to others:

### INTRODUCTION

1.    This case concerns Defendant's unlawful business practice of assessing $30.00 overdraft fees ("OD Fees") on (1) transactions that did not actually overdraw the account balance, (2) debit card transactions authorized on sufficient funds, and (3) multiple fees on an item.

2.    These practices breach promises made in Defendant's adhesion contract, which includes the Membership and Account Agreement attached hereto as Exhibit A, the Overdraft Opt-In Form attached hereto as Exhibit B, and the Fee Schedule attached hereto as Exhibit C (collectively, the "Contract').

3.    Plaintiff and other Defendant customers have been injured by Defendant's improper fee maximization practices. Plaintiff, individually and on behalf of the classes of individuals preliminarily defined below, brings claims for Defendant's breach of contract,

1

including the duty of good faith and fair dealing, and violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

## PARTIES

4. Plaintiff is a citizen of Virginia and a resident of Fredericksburg, Virginia. She has maintained a checking account with Defendant at all times material hereto.

5. Defendant is a federal credit union with nearly $540 million in assets. Defendant maintains its headquarters and principal place of business in this District in Richmond, VA. Defendant is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the Classes, in this District.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a State different from the Defendant. The number of members of the proposed Classes in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

7. This Court also has original jurisdiction under 28 U.S.C. §§ 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act (Regulation E) C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 *et seq*.)).

8. Furthermore, this Court has supplemental jurisdiction over Plaintiff's claims for breach of contract, including breach of the duty of good faith and fair dealing, because it is so related to Plaintiff's claim for violations of the Electronic Fund Transfers Act (Regulation E) that it forms part of the same case or controversy under Article III of the United States Constitution.

9.    This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District and in Virginia.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters.

## BACKGROUND FACTS

11.    In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America*, N.Y. TIMES (Mar. 9, 2023), https://tinyurl.com/26jcrfcm.

12.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white accountholders are among those who were more likely to be assessed overdraft fees. *Overdrawn: Consumer Experiences with Overdraft*, PEW CHARITABLE TRUSTS 8 (June 2014), https://bit.ly/3ksKD0I.

13.    Because of this, industry leaders like Capital One and Citi stopped assessing OD and NSF Fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC NEWS (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; *Banking with No Overdraft Fees*, CAPITAL ONE, https://tinyurl.com/4x7ffjvf (last accessed July 10, 2023); Matt Egan, *Citi is the First Mega Bank to Kill Overdraft Fees*, CNN BUS. (Feb. 24, 2022), https://tinyurl.com/48859b3x. Smaller institutions have followed suit and likewise stopped charging OD and NSF Fees. *See, e.g.*, *You Should Never Pay Overdraft Fees Again*, ALLIANT

CREDIT UNION, https://tinyurl.com/2h9fasas (last accessed July 24, 2023); *No Overdraft Fees. More Overdraft Coverage*, ALLY BANK, https://www.ally.com/overdraft/ (last accessed July 24, 2023).

14.    Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau ("CFPB") ordered Regions Bank to pay $141 million to reimburse consumers for OD Fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

15.    In October 2022, the CFPB again declared that the assessment of OD Fees on debit card transactions authorized on sufficient funds may constitute an "unfair act or practice" because consumers cannot reasonably avoid these "unanticipated" OD Fees. *See Circular 2022-06, Unanticipated Overdraft Fee Practices*, Cons. Fin. Protection Bureau (Oct. 26, 2022), https://bit.ly/3VJm3uB.

16.    In December 2022, the CFPB ordered Wells Fargo Bank, N.A. to refund $205 million in such "Authorized-Positive Overdraft Fees" and again declared such practice to be "unfair, deceptive, or abusive" in violation of federal law. Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 ¶¶ 47, 60 (Dec. 20, 2022) (Dkt. 1), https://bit.ly/3ZdnwMM. The CFPB reasoned that "[c]onsumers may be taken by surprise when they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonable avoidable because they were contrary to consumers' reasonable expectations." *Id.* at ¶ 44.

17.     The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

18.     In line with this industry trend, the New York Attorney General recently asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

19.     In May 2023, the National Credit Union Administration, which regulates Defendant, stated that the same practices at issue here – the assessment of OD Fees on APSN Transactions and multiple fees on an item – was "detrimental" to consumers, "especially those of modest means." NCUA Chairman Todd M. Harper Remarks at the Indiana Credit Union League dated May 19, 2023,  available at https://ncua.gov/newsroom/speech/2023/ncua-chairman-todd-m-harper-remarks-indiana-credit-union-league.

20.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

**I.  DEFENDANT ASSESSES OD FEES ON TRANSACTIONS THAT DO NOT OVERDRAW THE ACCOUNT**

21.     Plaintiff brings this action challenging Defendant's practice of charging Overdraft Fees on transactions that do not actually overdraw the account.

### A.  **The Contract**

22.     Plaintiff has a Defendant checking account, which is currently governed by the Contract.

23.     The Contract states:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Ex. B.

24.     The Contract also states that:

> If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it…

Ex. A at 3.

25.     In breach of these promises, Defendant assesses $30.00 OD Fees on transactions when the consumer *does* "have enough money in [the] account to cover a transaction." In other words, there are sufficient available funds in the account to pay the full amount of the check, draft, transaction or other item.

### A.  **Plaintiff's Transactions**

26.     On August 1, 2023, September 7, 2023, September 19, 2023 and September 20, 2023, Defendant charged Plaintiff $30 OD Fees even though the balance as shown on her bank statements demonstrated that she had enough money in the account to cover the transaction.

## II. DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.

27.    Plaintiff brings this action challenging Defendant's practice of charging Overdraft Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

28.    Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

29.    However, Defendant still assesses crippling Overdraft Fees on many of these transactions and misrepresents its practices in the Contract.

30.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses Overdraft Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

31.    Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

32.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

33.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur Overdraft Fees due to the unavailability of the funds held for earlier debit card transactions.

34.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges Overdraft Fees on APSN Transactions.

35.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners

found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

36.    There is no justification for these practices, other than to maximize Defendant's Overdraft Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge Overdraft Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

37.    But Defendant was not content with these millions in Overdraft Fees. Instead, it sought millions more in Overdraft Fees on APSN Transactions.

38.    Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

### i.    Mechanics of a Debit Card Transaction

39.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

40.    At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

41.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

42.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

43.    There is no change—no impact whatsoever—to the available funds in an account when transfer step occurs.

### ii.    Defendant's Contract

44.    Plaintiff has a Defendant checking account, which is currently governed by the Contract. Exs. A-C.

45.    Defendant promises in its Contract that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. B.

46.    The Contract also states:

**14. OVERDRAFTS -**

**a. Payment of Overdrafts.** If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it….

Ex. A at 3.

47.    In breach of these promises, Defendant assesses $30.00 OD Fees on transactions when the consumer does "have enough money in [the] account to cover a transaction." In other words, there are sufficient available funds in the account to pay the full amount of the check, draft, transaction or other item.

48.    Defendant further promises that authorization and payment occur simultaneously and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit card transaction:

We do *authorize and pay* overdrafts for the following types of transactions:

- Checks, ACH and other transactions made using your checking account number
- Automatic bill payments
- In-person withdrawals

…

We pay overdrafts at our discretion, which means we do not guarantee that we will always *authorize and pay* any type of transaction. If we do not *authorize and pay* an overdraft, your transaction will be declined.

11

…

What if I want Call Federal Credit Union to **_authorize and pay_** overdrafts on my ATM and everyday debit card transactions?

…

__ I want Call FCU to **_authorize and pay_** overdrafts on my ATM and everyday debit card transactions…

Ex. B (emphasis added).

49.    Defendant links payment to authorization **_five times_**, meaning that transactions are paid, and therefore overdrafts are determined, at authorization.

50.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Defendant assesses Overdraft Fees on them anyway.

51.    The above promises indicate that transactions are only overdraft transactions when they are authorized and approved into a negative account balance. Of course, that is not true for APSN Transactions.

52.    In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

53.    All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

54.    The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

55.     First, and most fundamentally, Defendant charges Overdraft Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

56.     Defendant's practice of charging Overdraft Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more Overdraft Fees than they should.

57.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

58.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

59.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

60.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an Overdraft Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

61.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

62.    This secret step allows Defendant to charge Overdraft Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

63.    In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

64.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

65.    Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed Overdraft Fees on APSN Transactions.

66.    Defendant and its accountholders make no such agreement. The Contract thus misleads and deceives account holders.

### iii.    Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

67.    Defendant's assessment of Overdraft Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

68.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

14

69.     Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

70.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

71.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

72.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

73.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca

Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

74.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

75.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

76.    Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

77.    The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft

practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

78.    Despite this recommendation, Defendant continues to assess Overdraft Fees on transactions that are authorized on sufficient funds.

79.    Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

80.    Defendant was also aware of consumers' confusion regarding Overdraft Fees but nevertheless failed to make its customers agree to these practices.

   **iv.    Plaintiff Was Assessed Overdraft Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

81.    On July 10, 2023 and August 1, 2023, Plaintiff was assessed $30.00 Overdraft Fees on debit card transactions, even though the transactions had been previously authorized on sufficient funds.

82.    Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to "cover" the transactions and should not have been assessed these fees.

**III.    DEFENDANT ASSESSES MULTIPLE FEES ON AN ITEM.**

83.    Defendant unlawfully maximizes its already profitable fees through its deceptive and contractually-prohibited practice of charging multiple NSF fees, or an NSF fee followed by an overdraft fee, on an item.

84.    Unbeknownst to consumers, when Defendant reprocesses an electronic payment item, ACH item, or check for payment after it was initially rejected for insufficient funds,

Defendant chooses to treat it as a new and unique item that is subject to yet another fee. But Defendant's contract never states that this counterintuitive and deceptive result could be possible and, in fact, says nothing at all about how overdraft fees or NSF fees are assessed.

85.     The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF Fee on the same item was a "deceptive and unfair act." *In the Matter of Higher One, Inc., Consent Order*, Consent Order, FDIC-1 1-700b, FDIC-1 1-704k, 2012 WL 7186313.

86.     The FDIC also recently recommended that the multiple fee practice be halted entirely. *See* Barbarino, Al. "FDIC Warns Banks About Risks of Bounced Check Fees." Law360, Aug. 19, 2022, *available at* https://www.law360.com/articles/1522501/fdic-warns-banks-about-risks-tied-to-bounced-check-fees.

87.     And, in its latest issue of Consumer Compliance Supervisory Highlights, the FDIC again addressed the charging of multiple non-sufficient funds fees for transactions presented multiple times against insufficient funds in the customer's account. *See FDIC Consumer Compliance Supervisory Highlights, Mar. 2022, available at* https://www.fdic.gov/news/financial-institution-letters/2022/fil22014.html. FDIC examiners have scrutinized this issue in recent exams, with some exams remaining open pending resolution of the issue.

88.     In the Supervisory Highlights, the FDIC discussed potential consumer harm from this practice in terms of both deception and unfairness under the Federal Trade Commission Act Section 5's prohibition on unfair or deceptive acts or practices. The FDIC stated that the "failure

to disclose material information to customers about re-presentment practices and fees" may be deceptive. *Id*. at 8.

89.     During 2021, the FDIC identified consumer harm when financial institutions charged multiple NSF fees for the re-presentment of unpaid transactions. Terms were not clearly defined and disclosure forms did not explain that the same transaction might result in multiple NSF fees if re-presented. While case-specific facts would determine whether a practice is in violation of a law or regulation, the failure to disclose material information to customers about re-presentment practices and fees may be deceptive. This practice may also be unfair if there is the likelihood of substantial injury for customers, if the injury is not reasonably avoidable, and if there is no countervailing benefit to customers or competition. For example, there is risk of unfairness if multiple fees are assessed for the same transaction in a short period of time without sufficient notice or opportunity for consumers to bring their account to a positive balance. *Id*.

90.     In its staff analysis of the issue, the American Bankers Association recommended that banks review their deposit account agreement to ensure it states clearly that a separate NSF fee will be assessed whenever the same item is resubmitted against insufficient funds. ABA also encouraged banks, if scrutinized by a regulator, to explain the significant logistical challenges with identifying items that have been resubmitted by the merchant for payment against insufficient funds. ABA is updating its staff analysis of this issue to reflect the Supervisory Highlights. *See* ABA Banking Journal, *FDIC provides guidance on multiple NSF fees for re-presented items*, April 1, 2022, *available at* https://bankingjournal.aba.com/2022/04/fdic-provides-guidance-on-multiple-nsf-fees-for-re-presented-items/.

91.     Further, this abusive multiple fee practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not

undertake the practice of charging more than one fee on the same item when it is reprocessed. Instead, Chase charges one fee even if an item is reprocessed for payment multiple times.

92.    Defendant, however, engages in this abusive and deceptive practice in violation of its own contract and against the reasonable expectations of its customers.

93.    The Contract allows Defendant to take certain steps when paying a check, electronic payment item, or ACH item when the accountholder does not have sufficient funds to cover it. Specifically, Defendant may (a) pay the item and charge a $30.00 fee; or (b) reject the item and charge a $30.00 fee.

94.    In contrast to the Contract, however, Defendant regularly assesses two or more $30.00 fees on an item.

**A. The Imposition of Multiple Fees on an Item Violates Defendant's Express Promises and Representations**

95.    The Contract provides the general terms of Plaintiff's relationship with Defendant, and therein Defendant makes explicit promises and representations regarding how an item will be processes, and how fees may be assessed.

96.    The Contract states that: "Your account may be subject to a charge for each item regardless of whether we pay or return the item." Ex. A. at 3.

97.    The Fee Schedule states:

| Non Sufficient Funds (NSF) / Overdraft Fee (Includes: Check, ATM, Courtesy Pay and all other electronic debits due to non-sufficient funds / overdraft.) | $30.00 / Item |
|---|---|

98.    These promises mean that Defendant may assess "a charge" (singular) of "$30/item."

99.    In breach of this promise, Defendant assesses multiple $30 NSF Fees per item or a $30 NSF Fee followed by a $30 overdraft fee per item.

100.    The same "item" on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

101.    There is zero indication anywhere in the Contract that the same item is eligible to incur multiple fees.

102.    Even if Defendant reprocesses an instruction for payment, it is still the same "item." Its reprocessing is simply another attempt to effectuate an account holder's original order or instruction.

103.    The Contract never discusses a circumstance where Defendant may assess multiple fees for a single check, ATM, or other electronic debit item that was returned for insufficient funds and later reprocessed one or more times and returned again.

104.    In sum, Defendant promised that one fee would be assessed on an item, and this term must mean all iterations of the same instruction for payment. As such, Defendant breached the Contract when it charged more than one fee per item.

105.    Reasonable consumers understand any given authorization for payment to be one, singular "item," as that term is used in the Contract.

106.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same item will be treated as the same "item," which Defendant will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere do Defendant and its customers agree that Defendant will treat each reprocessing of a check, electronic payment item, or ACH item as a separate item, subject to additional fees.

107.    Customers reasonably understand, based on the language of the Contract, that Defendant's reprocessing of checks, electronic payment items, and ACH items are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger fees. In other words, it is always the same item.

108.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it.

109.    Community Bank, NA, discloses its fee practice in its online banking agreement, in all capital letters, as follows:

> We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. **You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.**

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank N.A. 5 (Nov. 12, 2019), https://bit.ly/3uQafe7 (emphasis added).

110.    Defendant's Contract provides no such authorization, and actually promises the opposite – Defendant may charge, at most, a fee, per item.

**B. Plaintiff's Experience**

111.    In support of Plaintiff's claim, Plaintiff offers an example of a fee that should not have been assessed against Plaintiff's checking account. As alleged below, Defendant: (a) reprocessed a previously declined item; and (b) charged a fee upon reprocessing.

112.     On or around September 28, 2023, Plaintiff attempted an ACH payment.

113.    Defendant rejected payment of that item and charged Plaintiff a $30.00 ACH RETURN FEE for doing so.

114.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around September 29, 2023, Defendant processed the same item again, and charged Plaintiff a second $30.00 ACH RETURN FEE for doing so.

115.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around September 29, 2023, Defendant processed the same item again, and charged Plaintiff a third $30.00 ACH RETURN FEE for doing so.

116.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around September 29, 2023, Defendant processed the same item again, and charged Plaintiff a fourth $30.00 ACH RETURN FEE for doing so.

117.    *In sum, Defendant charged Plaintiff $120 in fees on an item.*

118.    Plaintiff understood each of these payments to be a single item as is laid out in the Contract, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it.

119.    Defendant understood this too because, upon information and belief, an item that has previously been rejected for insufficient funds and re-presented for payment is labelled as a 'RETRY PYMT' in Defendant's back office records. In other words, Defendant knows that it is simply a retry of the original item and not a new item subject to a new fee.

## IV.    NONE OF THESE FEES WERE ERRORS.

120.    The improper fees charged by Defendant were not errors by Defendant, but rather intentional charges made by Defendant as part of its standard processing of transactions.

121.    Plaintiff therefore had no duty to report the fee as an error.

122.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fee.

## V.    THE IMPOSITION OF FEES IN THIS MANNER BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING.

123.    Parties to a contract are required not only to adhere to the express terms of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

124.    Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers— Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged fees in the manner set forth herein.

125.    Defendant exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. Defendant also abuses the power it has over customers and their accounts and acts contrary to their reasonable expectations under the Contract. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

126.    Further, Defendant maintains complete discretion not to assess fees at all. Instead, Defendant always charges these fees. By always exercising its discretion in its own favor—and to

the prejudice of Plaintiff and other customers, Defendant breaches the reasonable expectations of Plaintiff and other customers and, in doing so, violates its duty to act in good faith.

127.    It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

128.    When Defendant charges improper fees in this way, Defendant uses its discretion to define the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ALLEGATIONS

129.    Plaintiff brings this action individually and as a class action on behalf of the following proposed Classes:

> **The Account Balance Class:** All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were charged Overdraft Fees on transactions that did not actually overdraw a checking account.

> **The APSN Class**: All consumers who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

> **The Multiple Fee Class**: All consumers who, during the applicable statute of limitations, were Defendant checking account holders as were assessed multiple fees on an item.

Plaintiff reserves the right to modify or amend the definition of the Classes as this litigation proceeds.

130.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who

make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

131.    The time period for the Classes is the number of years immediately preceding the date on which this Petition was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

132.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

133.    The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

134.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

135.    Among the questions of law and fact common to the Classes include:

    a.    Whether Defendant charged OD Fees when the account balance was not actually overdrawn;

    b.    Whether Defendant charged OD Fees on APSN Transactions;

    c.    Whether Defendant charged multiple fees on an item;

d.   Whether these fee practices breached the Contract and Defendant's duty of good faith and fair dealing;

e.   Whether Defendant violated Regulation E;

f.   The proper method or methods by which to measure damages; and

g.   The declaratory and injunctive relief to which the Classes are entitled.

136.   Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

137.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

138.   Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

139.   Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees. Plaintiff and the Class members are entitled

to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT, INCLUDING BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
*(On Behalf of Plaintiff and the Account Balance Class)*

140.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

141.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's account documents. *See* Exs. A-C.

142.    All contracts entered by Plaintiff and the Account Balance Class are identical or substantively identical because Defendant's form contracts were used uniformly.

143.    Defendant has breached the express terms of its own agreements as described herein.

144.    Virginia imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

145.    Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and other customers by charging improper fees.  This is an abuse of the power that Defendant has over Plaintiff and her bank account, is contrary to Plaintiff's reasonable expectations under the Contract, and breaches Defendant's implied covenant to engage in fair dealing and to act in good faith.

146.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

147.    Defendant has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

148.    Defendant harms Plaintiff and members of the Account Balance Class by abusing its contractual discretion that no reasonable customer would anticipate.

149.    Plaintiff and members of the Account Balance Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

150.    Plaintiff and members of the Account Balance Class have sustained damages because of Defendant's breach of the Contract.

151.    Plaintiff and members of the Account Balance Class have sustained damages because of Defendant's breach of the covenant of good faith and fair dealing.

152.    Plaintiff and members of the Account Balance Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## SECOND CLAIM FOR RELIEF
## BREACH OF CONTRACT, INCLUDING BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### *(On Behalf of Plaintiff and the APSN Class)*

153.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

154.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's account documents. *See* Exs. A-C.

155.    All contracts entered by Plaintiff and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

156.    Defendant has breached the express terms of its own agreements as described herein.

157.    Virginia imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

158.    Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and other customers by charging improper fees.  This is an abuse of the power that Defendant has over Plaintiff and her bank account, is contrary to Plaintiff's reasonable expectations under the Contract, and breaches Defendant's implied covenant to engage in fair dealing and to act in good faith.

159.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

160.    Defendant has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

161.    Defendant harms Plaintiff and members of the APSN Class by abusing its contractual discretion that no reasonable customer would anticipate.

162.    Plaintiff and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

163.    Plaintiff and members of the APSN Class have sustained damages because of Defendant's breach of the Contract.

164.    Plaintiff and members of the APSN Class have sustained damages because of Defendant's breach of the covenant of good faith and fair dealing.

165.    Plaintiff and members of the APSN Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

**THIRD CLAIM FOR RELIEF**
**BREACH OF CONTRACT, INCLUDING BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
*(On Behalf of Plaintiff and the Multiple Fee Class)*

166.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

167.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's account documents. *See* Exs. A–C.

168.    All contracts entered by Plaintiff and the Multiple Fee Class are identical or substantively identical because Defendant's form contracts were used uniformly.

169.    Defendant has breached the express terms of its own agreements as described herein.

170.    Virginia imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account

holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

171.    Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and other customers by charging improper fees.  This is an abuse of the power that Defendant has over Plaintiff and her bank account, is contrary to Plaintiff's reasonable expectations under the Contract, and breaches Defendant's implied covenant to engage in fair dealing and to act in good faith.

172.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

173.    Defendant has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

174.    Defendant harms Plaintiff and members of the Multiple Fee Class by abusing its contractual discretion that no reasonable customer would anticipate.

175.    Plaintiff and members of the Multiple Fee Class have performed all, or substantially all, of the obligations imposed on them under the Contract.

176.    Plaintiff and members of the Multiple Fee Class have sustained damages because of Defendant's breach of the Contract.

177.    Plaintiff and members of the Multiple Fee Class have sustained damages because of Defendant's breach of the covenant of good faith and fair dealing.

178.    Plaintiff and members of the Multiple Fee Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## FOURTH CLAIM FOR RELIEF
### Violation of Electronic Fund Transfers Act (Regulation E)
### C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 et seq.))
### (On Behalf of Plaintiff and the Classes)

179.    Plaintiff incorporates by reference the preceding paragraphs.

180.    By charging overdraft fees on APSN Transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

181.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).)

182.    To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

183.     The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

184.     Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

185.     Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions. Plaintiff and members of the Classes have been harmed by Defendant's practice of assessing OD Fees on one-time debit card and ATM transactions when, under Regulation E, Defendant did not have authority to do so.

186.     As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Classes.

187.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Classes are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.    Certification for this matter to proceed as a class action;

b.    Designation of Plaintiff as the Class Representative and designation of the undersigned as Class Counsel;

c.    Declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its contractual promises;

d.    Enjoining Defendant from breaching its account documents and continuing to assess OD Fees in violation of Regulation E;

e.    Restitution of all improper fees paid to Defendant by Plaintiff and the Classes because of the wrongs alleged herein in an amount to be determined at trial;

f.    Actual damages in amount according to proof;

g.    Pre- and post-judgment interest at the maximum rate permitted by applicable law;

h.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

i.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated: October 18, 2023

Respectfully submitted,

*/s/ Devon J. Munro*
Devon J. Munro (VSB # 47833)
MUNRO BYRD, P.C.
120 Day Ave. SW, Suite 100
Roanoke, VA 24016
(540) 283-9343
dmunro@trialsva.com

Lynn A. Toops*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV*
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gstranch@stranchlaw.com

Christopher D. Jennings*
THE JOHNSON FIRM
610 President Clinton Ave, Suite 300
Little Rock, AR 72201
(501) 372-1300
chris@yourattorney.com

*Pro hac vice* applications forthcoming

*Counsel for Plaintiff and the Proposed Classes*