## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| ASHLEY GARRETT, on behalf of<br>herself and all others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-678–HEH |
| | ) | |
| CALL FEDERAL CREDIT UNION, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION
### (Denying Defendant's Motion to Dismiss)

THIS MATTER is before the Court on Call Federal Credit Union's ("Defendant")

Motion to Dismiss (the "Motion," ECF No. 11), filed on December 14, 2023. Plaintiff

Ashley Garrett ("Plaintiff") filed her Complaint (ECF No. 1) on October 18, 2023,

alleging breaches of contract and violations of the Electronic Fund Transfer Act (the

"EFTA," 15 U.S.C. § 1693, *et seq.*, implemented at 12 C.F.R. § 1005). (Compl. ¶¶ 140–

87.) Defendant now moves to dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6). (Mot. at 1.) The parties have filed memoranda supporting their

respective positions, and the Court heard oral argument on March 6, 2024. At the

hearing, the Court denied Defendant's Motion for the reasons articulated below. (Minute

Entry at 1, ECF No. 38.)

### I. BACKGROUND

Defendant is a federal credit union headquartered in Richmond, Virginia, that

provides banking services to consumers. (Compl. ¶ 5.) Plaintiff lives in Fredericksburg,

Virginia, and maintains a checking account with Defendant. (*Id.* ¶ 4.) The parties agree that Plaintiff and Defendant entered into a Membership and Account Agreement (the "Agreement") which governs this case. (*See id.* ¶¶ 2, 22, 44, 95, 141, 154, 167; Mem. in Supp. at 5, ECF No. 12.) However, the parties disagree as to which version of the Agreement controls. (Resp. in Opp'n at 5, ECF No. 24.) Plaintiff relies on the version of the Agreement attached to its Complaint (the "2013 Agreement," ECF No. 1-1), while Defendant relies on the version attached to its Motion (the "2019 Agreement,"[1] ECF No. 12-1), asserting that Plaintiff's version is outdated. Plaintiff disputes the authenticity of the 2019 Agreement. (Resp. in Opp'n at 5.)

The 2013 Agreement states:

> If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it.

(Compl. ¶ 24 (quoting 2013 Agreement ¶ 14(a)).)

Plaintiff challenges Defendant's alleged practice of charging overdraft fees on "Authorize Positive, Settle Negative Transactions," or "APSN Transactions." (*Id.* ¶ 27.) According to Plaintiff, when a customer makes a debit card transaction, Defendant immediately reduces the customer's account balance by the transaction amount, setting aside the necessary funds and adjusting the displayed "available balance" to reflect the deduction. (*Id.* ¶ 28.) The funds held back by Defendant are unavailable for the

---

[1] There remains an issue of fact as to whether Plaintiff agreed to the purported 2019 Agreement. (*See* Resp. in Opp'n at 5.)

customer's use, having already been designated for paying for a specific transaction. (*Id.* ¶ 31.) Yet even though the customer's account initially had sufficient funds to cover the transaction because Defendant already held back the funds for payment, Defendant still charges an overdraft fee when, days later, the transaction settles into a negative account balance. (*Id.* ¶¶ 29–30.)

Even when a transaction with held-back funds does not overdraft the consumer's account, Defendant allegedly nonetheless assesses an overdraft fee on that same transaction when—during a subsequent, unrelated transaction—the account is overdrawn. (*Id.* ¶¶ 33, 35.) This fee is assessed in addition to the separate overdraft fee assessed on the subsequent, unrelated transaction. (*Id.*) In essence, when another transaction overdrafts the account, the bank assesses overdraft fees on that transaction *and* the previous transaction—despite that money having already been set aside.

Defendant charged Plaintiff $30 in overdraft fees for transactions on four (4) different days in 2023—even though Plaintiff's account balance had sufficient funds to cover the transactions. (*Id.* ¶¶ 25–26.) Plaintiff characterizes this practice as deceptive, misleading, and without any justification, other than to maximize Defendant's overdraft fee revenue. (*Id.* ¶¶ 35–36.) Defendant, however, contests Plaintiff's characterization of this process. Defendant claims that when a customer initially conducts a debit card transaction, the funds are not "set aside" as Plaintiff alleges. (Mem. in Supp. at 7–9.) And rather than a deceptive APSN scheme, Plaintiff was simply charged a fee each time the vender's bank requested money based on her debit card purchase. While this may indeed be the case, the Court must take Plaintiff's allegations as true at this stage.

3

Plaintiff also alleges that Defendant charges multiple fees for a single rejected item, in violation of the Agreement. (*Id.* ¶¶ 95–110.) Plaintiff states that Defendant rejects payment of an item, charging Plaintiff a $30 "return fee," and then—without Plaintiff's knowledge or understanding—reprocesses payment for the same item three [(3)] more times, resulting in three [(3)] additional $30 "return fees." (*Id.* ¶¶ 111–18.) Plaintiff contends that Defendant is aware that it assesses multiple fees on a single item because items which are rejected and submitted for repayment are labeled "RETRY PYMT" in Defendant's back-office records. (*Id.* ¶ 119.) Plaintiff also asserts that this practice is inconsistent with its contract and its representations and promises to consumers.

Finally, Plaintiff alleges that Defendant misrepresents its overdraft practices in its Opt-In Form (ECF No. 1-2), in violation of 12 C.F.R. § 1005 ("Regulation E"), specifically the opt-in rule contained in § 1005.17. (Compl. ¶¶ 179–84.) Plaintiff argues that the Opt-In Form fails to satisfy § 1005.17 because it does not adequately describe Defendant's overdraft practices. (*Id.* ¶ 184.) As a result of Defendant's inadequate Opt-In Form, Defendant failed to obtain Plaintiff's affirmative consent to overdraft fees, which is necessary to assess overdraft fees under Regulation E. (*Id.* ¶ 185.)

## II. LEGAL STANDARD

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the

4

grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey*, 706 F.3d at 387) (alteration in original).  However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678).

A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).  In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).  Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

For a Rule 12(b)(6) motion, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal citations omitted).  A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citations omitted).  "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit

prevails." *Id.* (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)) (alteration in original).

## III. ANALYSIS

Plaintiff asserts the following claims against Defendant: Count One (1) – Breach of Contract, including Breach of the Duty of Good Faith and Fair Dealing, on behalf of Plaintiff and the Account Balance Class; Count Two (2) – Breach of Contract, including Breach of the Duty of Good Faith and Fair Dealing, on behalf of Plaintiff and the APSN Class; Count Three (3) – Breach of Contract, including Breach of the Duty of Good Faith and Fair Dealing, on behalf of Plaintiff and the Multiple Fee Class; and Count Four (4) – Violation of EFTA (Regulation E) on behalf of Plaintiff and the Classes. (Compl. ¶¶ 140–87.) Defendant moves to dismiss the Complaint in its entirety. (Mot. at 1.)

The principal dispute here revolves around a Membership and Account Agreement. Plaintiff contends the Court should assess the 2013 Agreement. The 2013 Agreement contains reasonably ambiguous language regarding how Defendant assesses fees for each "item." Defendant, however, counters that the Court should consider the more recent 2019 Agreement. The 2019 Agreement is clear how Defendant assesses fees for each "item." Because the parties do not agree about which contract controls, the Court cannot dismiss Plaintiff's Complaint on its face. *See Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992) (finding that a court is unable to resolve contractual ambiguities at the motion to dismiss stage).

Defendant contends the 2019 Agreement is integral to the Complaint and authentic. (Reply at 3–4, ECF No. 34.) Plaintiff questions the authenticity of the 2019

Agreement. (Resp. in Opp'n at 5.)  Regardless of their dispute over authenticity, the parties disagree over which controls and the Court has no evidence before it to consider whether Plaintiff ever received the updated agreement.  Under Virginia law, even when one party can unilaterally modify a contract, both parties must still mutually assent.  *See Sonza v. 1st Advantage Fed. Credit Union*, No. 4:22-cv-114, 2023 WL 8535005, at *3–5 (E.D. Va. Oct. 5, 2023) (requiring a credit union to show the plaintiff received notice of the modification and continued to use their services after the notice to demonstrate assent to a new membership agreement).  Therefore, because the Court must construe the facts in the light most favorable to Plaintiff, and Plaintiff disputes the authenticity and applicability of the 2019 Agreement, the Court must consider the 2013 Agreement to be controlling for the purpose of Defendant's Motion.  *See Goines*, 822 F.3d at 166; *Nemet Chevrolet*, 591 F.3d at 253.

### A.  Count One —Breach of Contract, including Breach of the Duty of Good Faith and Fair Dealing

At the hearing held on March 6, 2024, Plaintiff orally moved to dismiss Count One of the Complaint.  (Minute Entry at 1.)  The Court granted Plaintiff's Motion and, therefore, Count One will be dismissed.  (*See id.*)

### B.  Counts Two & Three—Breach of Contract, including Breach of the Duty of Good Faith and Fair Dealing for the APSN Class and Multiple Fee Class

In Counts Two and Three, Plaintiff asserts that Defendant breached the Agreement by violating its express terms and the implied covenant of good faith and fair dealing. (*See* Compl. ¶¶ 153–78.)  Plaintiff alleges that banks, in particular, are bound by a duty to

7

act with good faith and fair dealing with respect to their customers (Compl. ¶ 157). Furthermore, according to Plaintiff, Defendant utilized APSN and assessed multiple fees in violation of their contract. (*Id.*)

Defendant argues that "Virginia courts do not recognize a stand-alone tort claim for breach of the implied covenant of good faith and fair dealing when the alleged breach is 'actively governed by express contractual terms.'" (Mem. in Supp. at 27 (quoting *Carr v. Fed. Nat'l Mortg. Ass'n*, 92 Va. Cir. 472, 472 (2013)).)  Defendant also contends that merely enforcing a contractual right does not violate the obligation to act in good faith. (Mem. in Supp. at 27.)  Furthermore, Defendant argues that it did not breach the contract because Plaintiff's APSN theory is simply not how Defendant's system functions and the credit union assesses fees in accordance with the terms of the contract. (*Id.* at 4–10.)

### i. Counts Two and Three—Breach of Duty of Good Faith and Fair Dealing

Virginia recognizes a cause of action for breach of the implied duty of good faith and fair dealing covenant when a party uses bad faith in exercising contractual discretion. *See Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998).  The implied covenant does not abrogate express contractual duties and rights. *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997).  Nevertheless, "a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party," and, consequently, a cause of action may arise when a party exercises contractual discretion in bad faith. *Va. Vermiculite*, 156 F.3d at 542 (emphasis in original).

8

Plaintiff argues Defendant drafted a contract "with terms not readily discernible to a lay person" and then "abused its discretion in its own favor." (Compl. ¶¶ 157–58.) Plaintiff reiterates these allegations for both Count Two and Count Three. (*See id.* ¶¶ 170–71.) Specifically, Plaintiff clarifies in its Response to the Motion that "Plaintiff alleges that Call FCU abused its discretion under the contract by interpreting key terms in its Contract in an unreasonable way that violates common sense and consumers' reasonable expectations in order to assess more fees." (Resp. in Opp'n at 23; *see also* Compl. ¶¶ 127–28.) In other words, Defendant allegedly defined terms of the contract in their favor and that act of defining terms was a breach of the duty of good faith. Thus, Plaintiff's "claim does not turn on whether Defendant abused its discretion, but instead turns on whether Defendant has a contractual *right* to charge multiple fees (i.e., whether 'item' means a request for payment or an instruction to pay)." *Mawyer v. Atl. Union Bank*, No. 3:21CV726, 2022 WL 1049311, at *7 (E.D. Va. Apr. 7, 2022) (emphasis in original). Consequently, "Plaintiff can properly state a claim for breach of the implied duty of good faith and fair dealing only through alleging that Defendant acted dishonestly." *Id.*

The Court at this stage concludes Plaintiff has sufficiently pleaded that Defendant exercised its discretion dishonestly. Thus, Plaintiff's allegations of the breach of the duty of good faith and fair dealing survive.

### ii. TISA Preemption for Breach of Contract in Count Two and Count Three

Defendant also argues that Plaintiff's state law contract claims are preempted by the Truth in Savings Act ("TISA"), 12 U.S.C. §§ 4301–4313, and its implementing regulation, 12 C.F.R. § 707. (Mem. in Supp. at 28.) Defendant asserts that the TISA regulates credit unions' disclosures of fee amounts and the conditions under which fees may be imposed, and that the TISA preempts any inconsistent state laws. (*Id.*) Defendant characterizes Plaintiff's purported contract claims as challenges to Defendant's fee disclosure practices. (*Id.* at 29.) Thus, Defendant argues that Plaintiff is merely "recasting otherwise preempted claims as state-law contract [] claims" and, consequently, they are preempted by the TISA. (*Id.* at 30 (quoting *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 341 (4th Cir. 2007)).)

Plaintiff argues that enforcing state law contract claims against Defendant is not inconsistent with the TISA and, therefore, not preempted by the TISA. (Resp. in Opp'n at 25–26.) Additionally, Plaintiff disputes Defendant's characterization of her argument. (*Id.* at 26.) Plaintiff contests that her contract claims allege that Defendant's practices violate its own contract, not that Defendant's practices are otherwise illegal. (*Id.* at 26–28.)

Federal laws preempt state laws that "interfere with, or are contrary to, federal law." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (internal quotations and citation omitted). Congress may preempt state law by expressly stating its intent to do so; otherwise, federal law impliedly preempts state laws when the

two are inconsistent or when federal law occupies the entire field of regulation. *Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108, 1111 (4th Cir. 1988). "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Here, the TISA's enacting regulation explicitly preempts "[s]tate law requirements that are inconsistent with the requirements of the TISA and [12 C.F.R. § 707], . . . to the extent of the inconsistency." 12 C.F.R. § 707.1(d). However, state law contract claims are not inconsistent with the requirements of the TISA and § 707. *Fludd v. S. State Bank*, 566 F. Supp. 3d 471, 484–85 (D.S.C. 2021). In *Fludd*, the plaintiffs brought breach of contract claims against a bank, alleging that the bank's practices related to non-sufficient funds and overdraft fees violated the contracts between the plaintiffs and the bank. *Id.* at 475–76. The court held that the plaintiff claims were not preempted by the TISA because they alleged that the bank violated its own contract, not that the bank's disclosure practices were insufficient. *Id.* at 484–85. Consequently, the breach of contract claims were not inconsistent with the requirements of the TISA. *Id.*

Defendant points to *Monson v. Capital Credit Union*, as an authority disagreeing with Plaintiff's position and *Fludd*. (Mem. in Supp. at 28–29 (citing No. 08-2022-CV-01697, 2023 WL 4174471 (N.D. Dist. Apr. 06, 2023)).) Defendant misunderstands the distinction between *Fludd* and *Monson*. In *Monson*, the North Dakota District Court held that challenging NSF policies and practices as "wrongful, unfair, and unconscionable" under the guise of breach of contract was not permitted, due to preemption by the TISA. *See* 2023 WL 4174471, at *3. It is important to distinguish, however, between asking the

11

Court to declare practices or policy to be unconscionable and asking the Court to conclude these practices violate the contract between parties. Here, Plaintiff refers to Defendant's alleged practices as "deceptive, unfair, and unconscionable" (Compl. ¶ 38), but Plaintiff only seeks relief "[d]eclaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable *in light of its contractual promises*." (Compl. at 35 (emphasis added).) Thus, Plaintiff, like the plaintiffs in *Fludd*, seeks relief under state law only for breach of contract and does not allege that Defendant's fee disclosures or practices themselves were insufficient, wrongful, unfair, or unconscionable as a matter of state law. (Compl. at ¶¶ 153–78); *see Fludd*, F. Supp. 3d at 484–85. Thus, Plaintiff's state law contract claims are not preempted by the TISA.

### iii. Count Two—Breach of Contract (APSN Class)

Count Two alleges that Defendant breached the explicit terms of its contract with Plaintiff by charging overdraft fees on APSN transactions. (Compl. ¶¶ 153–65.) The parties agree that debit card transactions involve two steps: (1) authorization at the time the debit card is swiped; and (2) the merchant's later presentment or request for payment. (*See* Compl. ¶¶ 30, 39–41; Mem. in Supp. at 17.) The parties also agree that the steps "may occur hours or days apart," and intervening transactions may occur between the steps, sometimes resulting in a negative balance and overdraft fee. (Mem. in Supp. at 17; Compl. ¶¶ 30, 36.) However, Plaintiff alleges Defendant assesses an overdraft fee on debit card transactions made when the account had sufficient funds available at step one (1), and Defendant put aside sufficient funds for those transactions, as reflected by the "available balance" figure shown to the customer, but intervening transactions overdrew

the account prior to step two (2).  (*See* Compl. ¶¶ 27–30.)  Plaintiff labels these "APSN

transactions."  (*Id.* ¶ 30.)  Thus, Defendant improperly assesses overdraft fees at the time

of settlement and not authorization, in breach of the terms of the contract.  (Resp. in

Opp'n at 6.)  Finally, Plaintiff asserts that the Agreement is at least ambiguous as to

whether Defendant may assess overdraft fees on these APSN transactions.  (*Id.* at 10–14.)

Defendant seeks to dismiss Count II for failure to state a claim because the 2019

Agreement controls, and the 2019 Agreement is clear that transactions are subject to

overdraft fees at step two (2), not step one (1).  (*See* Mem. in Supp. at 5, 16–23.)

Defendant argues that the Agreement permits it to charge an overdraft fee for debit card

transactions that were pre-authorized with sufficient funds at the time of the purchase but

had insufficient funds at the time the merchant posts, or requests, payment for the

transaction.  (*See id.*)  Both versions of the Agreement state, in relevant part:

> If, on any day, the available balance in your share or deposit account is not
> sufficient to pay the full amount of a check, draft, transaction, or other item,
> plus any applicable fee, **that is posted to your account**, we may return the
> item or pay it, as described below. The Credit Union's determination of an
> insufficient available account balance may be made at any time **between
> presentation and the Credit Union's midnight deadline** with only one
> review of the account required.[2]

(2019 Agreement ¶ 14(a); 2013 Agreement ¶ 14(a) (emphasis added).)  The 2019

Agreement further states that: "Pending transactions and holds placed on your account

may reduce your available balance and may cause your account to become overdrawn

regardless of your actual balance.  In such cases, subsequent **posting** of the pending

---

[2] Though some of the language in both Agreements differ slightly, the overall meaning and the
emphasized sections here remain the same.

transactions may further overdraw your account and be subject to additional fees." (2019 Agreement ¶ 14(c).)  The 2019 Agreement specifies that transactions are posted when they are processed by the merchant and submitted to Defendant for payment.  (*Id.* ¶ 14(b).)  Defendant argues that nothing in the Agreement supports Plaintiff's claim that overdrafts are determined upon authorization at step one.  (Mem. in Supp. at 20.)

Additionally, Defendant disputes Plaintiff's claim that the authorization hold results in the payment being "set aside" and untouchable except to pay for the transaction.  (Mem. in Supp. at 21.)  Defendant counters that "[n]owhere does the [] Agreement state that the held funds are unavailable for use in other transactions." (Mem. in Supp. at 21.)

The Agreement is governed by Virginia law. (2013 Agreement ¶ 34; *see also* 2019 Agreement ¶ 34.)  Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).  Additionally, contract interpretation is a question of law for a court to decide. *Bolton v. McKinney*, 855 S.E.2d 853, 855 (Va. 2021).  Virginia law requires courts to "give effect to the intention of the parties as expressed in the language of their contract." *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 589 (4th Cir. 2023) (quoting *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998)).

Courts "cannot look beyond a contract's language absent ambiguity." *Id.* (citing *Amos v. Coffey*, 320 S.E.2d 335, 337 (Va. 1984)).  However, when there is ambiguity

regarding a contract's language, the parties must present extrinsic evidence to support their favored construction. *Online Res. Corp. v. Lawlor*, 736 S.E.2d 886, 894 (Va. 2013). The terms of a contract are ambiguous if they can reasonably impart two (2) or more meanings. *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012). Dismissal on a motion for failure to state a claim is inappropriate prior to consideration of evidence to resolve contractual ambiguities. *Va. is for Movers*, 2024 WL 1091786, at *3 (quoting *Martin Marietta Corp.*, 991 F.2d at 97).

Here, the parties disagree as to whether a breach occurred because they disagree as to whether the Agreement forbids fees for APSN transactions, and the 2013 Agreement itself is not clear. (*See* Resp. in Opp'n at 6; Mem. in Supp. at 16.) The parties also disagree as to whether APSN transactions are something Defendant actually does. (Reply at 4.) Whether or not Defendant "sets aside" money in a consumer's account is a factual dispute regarding Defendant's day-to-day practices and policies. Because Plaintiff's allegations are entitled to be taken as true, the Court concludes that Plaintiff plausibly alleges Defendant's conduct constitutes breach of contract and Count Two survives Defendant's Motion.

### iv. Count Three—Breach of Contract (Multiple Fee Class)

Count Three asserts that Defendant charged multiple overdraft fees on single transactions, in violation of the Agreement. (*See* Compl. ¶ 83.) Relying on the 2019 Agreement, Defendant asserts that there is no prohibition on multiple overdraft fees in the Agreement and the Agreement in fact affirmatively permits multiple overdraft fees. (Mem. in Supp. at 23; 2019 Agreement ¶ 14(a).) Defendant also asserts that the

15

Agreement is further governed by the National Automated Clearing House Association ("NACHA"). (Mem. in Supp. at 3.) NACHA establishes Operating Rules and Guidelines ("NACHA Rules") which permit Call Federal to assess overdraft fees for every request for payment by a merchant. (*Id.* at 3, 25.)

Plaintiff argues that the 2013 Agreement calls for a single overdraft fee for each item paid for and does not permit multiple overdraft fees on one item. (Resp. in Opp'n at 16–22.) Reading the language of the 2013 Agreement, Plaintiff contends it states "'Your account may be subject to a charge' [(singular)] 'for each item regardless of whether we pay or return the item.'" (*Id.* at 16 (quoting 2013 Agreement ¶ 14(a)).) Defendant's Fee Schedule also states the charge is "$30.00 / Item." (Fee Schedule, ECF No. 1-3.) Thus, Plaintiff argues that charging multiple fees for single transactions violates the Agreement.

Because the parties dispute which contract controls, the Court must assume the 2013 Agreement controls and looks to the language contained therein. In essence, the parties disagree as to the meaning of "item." Plaintiff interprets "item" to mean "an accountholder's instruction to pay," e.g., a check or debit card purchase. (Resp. in Opp'n at 3.) Defendant interprets "item" to mean "a request for payment." (Reply at 12–15.) Accordingly, Defendant reads the 2013 Agreement to allow Defendant to charge an overdraft fee "for each item [i.e., request for payment] regardless of whether we pay or return the item." Conversely, Plaintiff reads the 2013 Agreement to allow Defendant to charge an overdraft fee "for each item [i.e., accountholder's instruction to pay] regardless of whether we pay or return the item." Thus, under Plaintiff's interpretation, Defendant

16

can charge an overdraft fee once—when the account holder initially instructs the bank to pay—while, under Defendant's interpretation, Defendant can charge an overdraft fee multiple times—each time a merchant's bank requests the money from the bank.

Defendant asks the Court to adopt the Court of Appeals for the Seventh Circuit's reasoning in *Page v. Alliant Credit Union*, 52 F.4th 340 (7th Cir. 2022). (Mem. in Supp. at 24–25.) In *Page*, the plaintiff and the defendant presented precisely the same arguments as to the meaning of "item" as the parties do here, based on a similar membership agreement. *See Page*, 52 F.4th at 349. The court, however, found the plaintiff's reading of "item" as "a payment order that a *member* draws against insufficient funds" "untenable." *Id.* Defendant asks the Court to reach the same conclusion. For the reasons that distinguish *Page*'s membership agreement from the 2013 Agreement, the Court declines to adopt the Seventh Circuit's decision.

The membership agreement in *Page* stated, "We do not have to notify you if your account does not have funds to cover checks, *ACH debits*, debit card transactions, fees or other posted items." *Id.* (emphasis added). The 2013 Agreement's comparable language states: "We do not have to notify you if your account does not have sufficient available funds in order to pay an item." (2013 Agreement ¶ 14(a).) The Seventh Circuit interpreted "items" to have a related meaning with the words around it. *Id.* An ACH debit occurs when a payee (i.e., the merchant), not a payor (i.e., the customer), debits a person's account. Because this refers to a payee's debiting of an account, not the payor's transaction, the court rightly held that "other posted items" could not mean what the plaintiff proposed. Here, the Court has none of the same context clues. The 2013

17

Agreement never contains "ACH debits" and only references "ACH transactions" once, leaving it undefined. (*See* 2013 Agreement ¶ 14(a).) In fact, the Agreement contains the language: "a check, draft, transaction, or other item . . . that is posted to your account." (*Id.*) Such language does not support making the same conclusion the Seventh Circuit made in *Page*. Consequently, the Court cannot conclude Plaintiff's reading of "item" is untenable.

The 2019 Agreement is clear Defendant "may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." (2019 Agreement 14(a).) The 2013 Agreement, however, does little to aid the Court, or a customer, in interpreting whether Plaintiff's or Defendant's readings are correct. Accordingly, the Court concludes that because both parties allege reasonable interpretations of the meaning of "item," the 2013 Agreement is ambiguous.

Other courts in the Fourth Circuit have also regularly found the term "item" in banking contracts to be ambiguous in overdraft and NSF cases. *See, e.g., Mawyer*, 2022 WL 1049311, at *4; *Fludd*, 566 F. Supp. 3d at 488. If Plaintiff's interpretation of the ambiguity in the contract is right, it may plausibly allege a violation of the contract when Defendant charged for each request. Consequently, this ambiguity bars dismissal of Count Three for failure to state a claim at this stage.[3]

---

[3] Additionally, the Court must construe ambiguities in a contract against the drafter, here, Defendant.

### C. Count Four—Electronic Fund Transfers Act (Regulation E)

Count Four alleges that Defendant misrepresents its overdraft practices in its Overdraft Opt-In, which violates Regulation E's opt-in rule codified at 12 C.F.R. § 1005.17. (*See* Compl. ¶¶ 179–84). Defendant moves to dismiss this claim because "paragraph 184 of the Complaint fails to identify how Call Federal violated Regulation E and fails to state with any particularity what [Defendant] should have disclosed." (Mem. in Supp. at 26.) Defendant argues that Plaintiff's Regulation E allegations fail to establish sufficient facts to satisfy Federal Rules of Civil Procedure Rule 8(a)(2). (*Id.*) Defendant also asserts that Plaintiff solely added Count Four to establish federal jurisdiction. (*Id.*)

Paragraph 179 "expressly incorporates the dozens of preceding paragraphs that explain precisely how [Defendant] 'misrepresents [its] overdraft practices' and 'fail[s] to provide its customers with a valid description of the overdraft program . . . .'" (Resp. in Opp'n at 24.) The Complaint also identifies specific provisions in Defendant's Opt-In Form and Agreement that violate Regulation E. (*See, e.g.*, Compl. ¶¶ 23, 25, 45, 48–49, 51.)

It is well established that Rule 8(a)(2) does not require that each count in a complaint restate the factual basis for the right to relief; a count in a complaint may incorporate by reference facts alleged elsewhere in the complaint. *See, e.g., iSource Loans, LLC v. SunTrust Mortg., Inc.*, No. 2:13CV521, 2014 WL 3730289, at *3 (E.D. Va. Mar. 10, 2014). Under 12 C.F.R. § 1005.17, financial institutions may only charge overdraft fees to customers if the customer opts-in to the financial institution's overdraft

service. § 1005.17(b)(1). Customers' consent must be obtained in writing through a form that is segregated from all other information related to the customer's account and describes the overdraft service. *Id.* The opt-in form must be "substantially similar" to Model Form A-9, and provide, *inter alia*, descriptions of the types of transactions that may incur fees, the methodology for determining fee quantities, and limits on fees. § 1005.17(c). When a credit union-defendant charges overdraft fees for APSN transactions, but "nothing in [the opt-in form] suggests that APSN transactions incur overdraft fees," the opt-in form is at best "ambiguous," and "ambiguous language on an opt-in form plausibly violates Regulation E." *Va. is for Movers,* 2024 WL 1091786, at *15; *see also Hinton v. Atl. Union Bank*, No. 3:20-cv-651, 2020 WL 9348205, at *3 (E.D. Va. Nov. 2, 2020) (holding that the plaintiff plausibly stated a claim for a Regulation E violation because the plaintiff alleged facts that would show an ambiguous opt-in form).

Here, Plaintiff explicitly incorporates by reference the facts alleged in paragraphs 1–178 of its Complaint into its Regulation E violation allegation. (Compl. ¶¶ 179.) In doing so, Plaintiff has alleged facts to support its legal allegation, as required by Rule 8(a)(2). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff's allegations, if true, show that Defendant's opt-in form does not explain (1) when Defendant assesses overdraft fees, (2) that Defendant may charge multiple overdraft fees for the same transaction, and (3) that Defendant would pay overdraft fees for debit card transactions at all. Plaintiff's factual allegations render the opt-in form ambiguous and, thereby, plausibly in violation of Regulation E. Thus, Plaintiff has alleged facts sufficient to plausibly state a claim for Count Four.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion (ECF No. 11) will be denied. The Court will grant Defendant leave to renew its Motion, if appropriate, based on the discovery in this case.  On Plaintiff's oral motion, Count One of the Complaint will be dismissed without prejudice.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: August 23, 2024
Richmond, Virginia

21